UNITED STATES DISTRICT COURT FOR
THE WESTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. |
| | ) | |
| ADVANCED GLOBAL SERVICES, LTD., | ) | **COMPLAINT AND** |
| PARADIGM SHIFT TECHNOLOGIES, INC. | ) | **DEMAND FOR JURY TRIAL** |
| and GENNADY YUMSTYK | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## <u>COMPLAINT</u>

Plaintiff, the United States of America ("United States" or the "government"), brings

this action against Defendants Advanced Global Services, Ltd. ("AGS"), Paradigm Shift

Technologies, Inc. ("PST"), and Gennady Yumshtyk ("Yumshtyk") (collectively, the

"Defendants") to recover damages and penalties for false claims that Defendants submitted

or caused to be submitted to the United States, and for common law claims, in connection

with a Small Business Innovation Research ("SBIR") Phase II contract that AGS was

awarded by the Department of the Navy ("Navy"), and which was funded by the Department

of the Air Force ("Air Force") and the Navy. For its cause of action, the United States alleges

as follows:

### NATURE OF THE ACTION

1.     The United States brings this action to recover damages and civil penalties

under the False Claims Act ("FCA"), as amended, 31 U.S.C. §§ 3729-3733, and to recover

all available damages and other monetary relief under the common law and equitable theories

of fraud, unjust enrichment, and payment by mistake of fact.

2.     In 2019, AGS applied for and was awarded a SBIR Phase II contract by the Navy to "continue the investigation and development of the EPVD® [enhanced physical vapor deposition] technology and coatings to improve application quality and consistency with the goal of achieving higher throughput when coating medium caliber gun barrels" (the "SBIR Contract").

3.     Defendants made false and fraudulent statements, representations, and/or certifications to obtain the SBIR Contract and when requesting payment pursuant to the SBIR Contract.

4.     Among these false and fraudulent statements, representations, and/or certifications, Defendants falsely certified, in a SBIR Funding Agreement Certification signed by Yumshtyk on or about November 14, 2019, that all research and development ("R&D") under the SBIR Contract would occur within the United States.

5.     AGS did not perform all R&D work in the United States; rather R&D work for the SBIR Contract was performed in Canada at PST's facilities located at 60 Signet Drive, Toronto, Ontario, Canada.

6.     At the time Defendants certified that all R&D work would be performed in the United States, Defendants knew and intended that R&D work occur in Canada.

7.     Indeed, the SBIR Contract was not capable of being performed at AGS's location at 6114 Bunting Road, Orchard Park, New York because that location lacked the facilities, equipment, and personnel to perform R&D and other work for the SBIR Contract.

8.     6114 Bunting Road, Orchard Park, New York was a private residence that was used as a storage facility for PST and to falsely establish a presence in the United States to obtain government contracts, including the SBIR Contract.

9.      Defendants also falsely certified that AGS would perform at least half of the work under the SBIR Contract. Contrary to this representation, PST, not AGS, performed the work for the SBIR Contract.

10.     Defendants made numerous other false certifications and representation to obtain the SBIR Contract and associated payments, including falsely certifying that Yumshtyk was primarily employed by AGS and misrepresenting material information about AGS, contractors, employees, and expenses.

11.     Despite the promises Defendants made when entering the SBIR Contracts, Defendants did not conduct R&D work in the United States, AGS did not perform a majority of the work under the SBIR Contract, and Yumshtyk did not work primarily for AGS during the performance of the SBIR Contract.

12.     Nevertheless, Defendants submitted thirty-eight claims for payment to the United States starting on or about December 3, 2019, up until on or about March 8, 2023, for $3,731,344.99.

13.     Moreover, Defendants sought payment for costs and expenses, including labor expenses, that were not, in fact, incurred by AGS or were otherwise ineligible for reimbursement.

14.     When representatives of the United States asked Defendants about AGS's activities in the United States and the locations and duties of purported AGS employees, Defendants concealed their non-compliance with the requirements of the SBIR Contract.

15.     Defendants' misrepresentations and non-compliance with the SBIR Contract and SBIR rules and regulations were material to the government's decision to award the SBIR Contract in the first instance and to whether and how much the government paid AGS for

the claims AGS submitted between on or about December 3, 2019 and on or about March 8, 2023.

16.    Had government known of AGS's false statements, representations, and certifications, it would not have awarded the SBIR Contract to AGS nor would it have paid the AGS for the claims it submitted.

17.    As a result of Defendants fraudulent conduct, AGS improperly obtained $3,731,344.99 from the United States.

## JURISDICTION AND VENUE

18.    This Court has subject matter jurisdiction over this action pursuant to 31 U.S.C. § 3732(a), 28 U.S.C. § 1331, as a case arising under the laws of the United States, and § 1345, because the United States is a Plaintiff. In addition, the Court possesses supplemental jurisdiction to entertain the common law and equitable causes of action pursuant to 28 U.S.C. § 1367(a) and 31 U.S.C. § 3732(b) (jurisdiction over claims arising from the same transaction or occurrence as an action under the federal FCA).

19.    This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a) because Defendants can be found in, transacts business in, and/or have committed the alleged acts in the Western District of New York.

20.    Venue is proper in the Western District of New York pursuant to 27 U.S.C. § 1391(b)-(c) and 31 U.S.C. § 3732(a) because Defendants can be found in and transacts business in this District, a substantial part of the events or omissions giving rise to the claims occurred in this District, and Defendants is subject to the Court's personal jurisdiction under the FCA.

## PARTIES

21.    Plaintiff is the United States of America, acting on behalf of the Department of the Air Force and the Department of the Navy.

22.    Advanced Global Services Ltd., at all times relevant to this Complaint, was a Nevada corporation with its principal place of business at 6114 Bunting Road, Orchard Park, New York, and a subsidiary, affiliate, or *alter ego* of Paradigm Shift Technologies, Inc.

23.    Paradigm Shift Technologies, Inc., at all times relevant to this Complaint, was a Canadian entity that develops coating technologies for weapons systems and is located at 60 Signet Drive, Toronto, Ontario, Canada.

24.    Gennady Yumsthyk, at all times relevant to this Complaint, was United States permanent resident and was the president AGS and president and chief executive officer of PST.

## LEGAL AND REGULATORY BACKGROUND

### I.    THE FALSE CLAIMS ACT ("FCA")

25.    The FCA, 31 U.S.C. Sections 3729-33, provides, in pertinent part, that any person who:

> (a)(1)(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;
>
> (a)(1)(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; [or]
>
> (a)(1)(C) conspires to commit a violation of subparagraph (A) [or] (B) . . . .

is liable to the United States for three times the amount of damages which the Government sustains, plus a civil penalty per violation.  For violations occurring on or after November 2,

2015, the civil penalty amounts range from a minimum of $14,308 to a maximum of $28,618.

28 C.F.R. § 85.5.

26.     For purposes of the FCA:

> the terms "knowing" and "knowingly" (A) mean that a person, with respect to information—(i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information; and (B) require no proof of specific intent to defraud. . . .

31 U.S.C. § 3729(b)(1).

27.     The FCA defines "material" to mean "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property."  31 U.S.C. § 3729(b)(4).

## II.     THE SMALL BUSINESS INNOVATION RESEARCH ("SBIR") PROGRAM

28.     The Small Business Innovation Research ("SBIR") program was established by Congress to stimulate technological innovation in the private sector and strengthen the role of Small Business Concerns ("SBC") in meeting federal research and development ("R&D") needs.

29.     The program's specific objectives were to increase private-sector commercialization of innovations derived from federal R&D, increase the commercial application of these research results, increase employment, improve the United States's competitiveness, and encourage participation of socially and economically disadvantaged persons and women-owned small businesses.

30.     The SBIR program was divided into three funding and development stages, identified as Phase I, Phase II, and Phase III.

31.    Federal government departments and agencies that award contracts under the SBIR program, including the Navy, issued annual solicitations for the SBIR programs.

32.    A solicitation period was open and those SBCs selected for award were announced subsequent to its closing.

33.    The solicitations provided all the information needed to submit proposals.

34.    However, only firms qualifying as SBCs were eligible to participate in the SBIR program.

35.    Section 9(j) of the Small Business Act, 15 U.S.C. § 638(j), which authorized the SBIR program, directed the SBA to "issue policy directives for the general conduct of the SBIR programs within the Federal Government."

36.    SBA published annual Policy Directives for the SBIR program, including in 2019. *See* 84 Fed. Reg. 12794.

37.    Among other things, the Policy Directives provided for standardized eligibility criteria for SBIR programs and required applicants to certify compliance with those eligibility criteria.

38.    The 2019 SBIR Policy Directive provided, among other things, that:

    i.   "For SBIR Phase II, a minimum of one-half of the research or analytical effort must be performed by the Awardee";

    ii.  "For both Phase I and Phase II, the primary employment of the Principal Investigator/Project Manager must be with the SBC . . . at the time of award and during the conduct of the proposed project. Primary employment means that more than one-half of the Principal Investigator/Project Manager's employment time is spent in the employ of the SBC  . . . . This precludes full-time employment with another organization"; and

    iii. "For both Phase I and Phase II, the R/R&D work must be performed in the United States."

39.    SBIR awardees are required to complete and sign SBIR Funding Agreement Certifications. The SBIR Funding Agreement Certifications must be completed and signed before the SBIR awardee can be paid under a SBIR contract.

40.    Among the certifications in the SBIR Funding Agreement Certifications that the SBIR awardee were required to make in 2019 were the following:

>     i.    "During the performance of award, it will perform the applicable percentage of work unless a deviation from this requirement is approved in writing by the funding agreement officer";
>
>    ii.    "During performance of award, the research/research and development will be performed at my facilities with my employees, excepts as otherwise indicated in the SBIR application and approved in the funding agreement";
>
>    iii.    "During the performance of the award, the principal investigator will spend more than one half of his/her time as an employee of the awardee or has requested and received a written deviation from his requirement from the funding agreement";
>
>    iv.    "During performance of award, the research/research and development will be performed in the United States unless a deviation is approved in writing by the funding agreement officer."

41.    SBA guidance regarding the SBIR program recognized that SBIR awardees may use foreign subcontractors and that "the sub-awardee does not have to be located in the United States.

42.    However, all of the R&D work performed by the sub-awardee must be done in the U.S., so an SBIR application involving a foreign sub-awardee needs to address how that person or entity will be able to fulfill the 'all R&D done in the US' requirement." *See* https://www.sbir.gov/sites/all/themes/sbir/dawnbreaker/img/documents/Course1-Tutorial2.pdf.

## THE FRAUDULENT CONDUCT

**I.    Defendants Submitted False Claims**

  **a. The SBIR Proposal**

43.    On February 28, 2019, Defendants submitted a proposal, N2-6969, on behalf of AGS for a SBIR Phase II award to the Navy (the "SBIR Proposal"), which contained information concerning the nature of AGS, AGS's capabilities, and AGS personnel who would perform the work on the SBIR Proposal.

44.    In the SBIR Proposal, Defendants represented that AGS had nine employees and that Yumshtyk was the principal investigator.

45.    Defendants listed AGS's address as 6114 Bunting Road, Orchard Park, New York and stated: "AGS maintains facilities dedicated to research, engineering and analytical work in the field of metals and coatings. These facilities are well equipped with all necessary testing and analytical equipment for required material fabrication of targets (coating material consumables) where targets can be designed and manufactured based on required material characteristics and applications."

46.    In fact, AGS did not maintain facilities as described in the SBIR Proposal.

47.    The facilities referenced in the SBIR Proposal were owned and/or controlled by PST.

48.    Defendants also represented that AGS was not affiliated, as affiliation is defined in 13 C.F.R. § 121.103, with any other company.

49.    Among the tests for affiliation under 13 C.F.R. § 121.103 is whether entities share common control.

50.     Contrary to this representation, AGS was affiliated with PST because Yumshtyk controlled both entities.

51.     Defendants also failed to disclose that Alon Surface Technologies Inc. and Prognostica—two purported "subcontractors" to AGS—were affiliated with AGS, despite both entities being owned and/or controlled by Yumshtyk and/or members of his immediate family.

### b. The SBIR Contract

52.     On or about November 14, 2019, the Navy awarded AGS a SBIR Phase II contract, N6833520C0013, based on the SBIR Proposal (the "SBIR Contract").

53.     Although the Navy awarded the contract, the contract was primarily funded by the Air Force.

54.     The SBIR Contract specified, among other things, that "[t]he Contracting Officer is the only person authorized to approve changes in the requirements of this contract" and that "[t]he technical point of contact does not have the authority to take any action, either directly or indirectly, that would change any of the contract terms . . . ."

55.     Among the terms of the SBIR Contract was that "[t]he research or R&D work contained in this contract must be performed by the small business concern in the United States, meaning the 50 states, and any territories and/or possessions of the [United States], plus the District of Columbia."

56.     The SBIR Contract terms also required that "[t]he contractor [*i.e.*, AGS] perform at least one-half of the research and/or analytic work under this contract unless approved in advance by the PCO."

57.     It further required that "[t]he primary employment of the principal investigator Gennady Yumshtyk shall be with the contractor [*i.e.,* AGS] during conduct of this contract."

### c. The SBIR Funding Agreement Certifications

58.     All SBIR awardees must complete a SBIR Funding Agreement Certification at the time of the award, and at other times during the performance of the award.

59.     Yumshtyk signed the SBIR Funding Agreement Certification on behalf of AGS's SBIR Contract on or about November 14, 2019.

60.     In the introduction to the SBIR Funding Agreement Certification that Yumshtyk signed, Defendants were cautioned to "[p]lease read carefully the following certification statements. The Federal government relies on the information to determine whether the business is eligible for a Small Business Innovation Research (SBIR) Program award."

61.     Defendants expressly certified in the SBIR Funding Agreement Certification that "[d]uring the performance of award, the research/research and development will be performed in the United States unless a deviation is approved in writing by the funding agreement officer."

62.     Defendants further certified that "at least half (50%) of the research" would be performed by AGS and that "[d]uring the performance of award, the research/research and development will be performed at my [AGS] facilities with my [AGS] employees, except as otherwise indicated in the SBIR application and approved in the funding agreement."

63.     Defendants also certified that "[d]uring the performance of the award, the principal investigator will spend more than one half of his/her time as an employee of the

awardee or has requested and received a written deviation from this requirement from the funding agreement officer."

64.    In signing the SBIR Funding Agreement Certification, which included the certifications identified above, Yumshtyk, acting on behalf of AGS, acknowledged and certified that "any intentional or negligent misrepresentation of the information contained in this certification may result in criminal, civil or administrative sanctions, including but not limited to (1) fines, restitution and/or imprisonment under 18 U.S.C. § 1001; (2) treble damages and civil penalties under the False Claims Act (31 U.S.C. § 3729 et seq.); (3) double damages and civil penalties under the Program Fraud Civil Remedies Act (31 U.S.C. § 3801 et seq.); (4) civil recovery of award funds; (5) suspension and/or debarment from all Federal procurement and nonprocurement tractions (FAR Subpart 9.4 or 2 C.F.R. part 180); and (6) other administrative penalties including termination of SBIR/STTR awards."

### d.  AGS's Performance of the SBIR Contract Contravened Its Representations and Certifications

#### i.  R&D for the SBIR Contract was performed outside the United States.

65.    Despite the SBIR program's requirement that R&D be performed in the United States, and despite Defendants' certification in the SBIR Funding Agreement Certification that "[d]uring the performance of award, the research/research and development will be performed in the United States," AGS did not perform R&D in the United States.

66.    The funding agreement officer did not approve, in writing or otherwise, a deviation to this requirement.

67.    Nevertheless, R&D for the SBIR Contract was performed at PST's facilities located at 60 Signet Drive, Toronto, Ontario, Canada.

68.     At all times relevant to this Complaint, Defendants did not intend that R&D would be performed in the United States, nor did AGS have the capabilities to do perform R&D in the United States.

69.     AGS's address, as listed in the SBIR Proposal and in the SBIR Contract, was 6114 Bunting Road, Orchard Park, New York (the "Orchard Park Location").

70.     The Orchard Park Location was the residence of John Iafallo, who was AGS's General Manager.

71.     Mr. Iafallo was the only person to work out of the Orchard Park Location.

72.     Mr. Iafallo is not an engineer and was not, in anyway, engaged in the R&D work that AGS agreed to perform under the SBIR Contract.

73.     The Orchard Park Location is Mr. Iafallo's residence, and it was used to store and facilitate the shipment of gun barrels to and from Canada and to and from Defendants' customers.

74.     The Orchard Park Location was not equipped to perform the R&D work proposed in the SBIR Proposal or agreed to in the SBIR Contract.

75.     The Orchard Park Location did not have any of the equipment or personnel that Defendants represented to be at AGS facilities in the SBIR Proposal.

**ii.  PST, not AGS, performed the work under the SBIR Contract.**

76.     The SBIR program rules required, and Defendants certified in the SBIR Funding Agreement Certification, that AGS would perform at least half of the work under the SBIR Contract.

77.     The funding agreement officer did not approve, in writing or otherwise, a deviation to this requirement.

78.     AGS did not perform half of the work under the SBIR Contract.

79.     PST was the entity performed the work.

80.     Indeed, PST holds itself out as the recipient of the SBIR Contract on its website, where it listed, among its accomplishment, a "Contract awarded by US Navy to commercialize the EPVD® coating technology and LRIP equipment for the improvement of medium caliber aircraft weapon systems" in November of 2019.

81.     This is the same project that AGS was to perform under the SBIR Contract.

82.     Yumshtyk also told a Canadian newspaper in 2024 that PST, not AGS, had been awarded SBIR funding.

83.     It is not surprising that PST held itself out as the SBIR Contract recipient because, as noted above, the work under the SBIR Contract, including the R&D work, was performed at PST's facilities in Canada—not at AGS—and by PST's employees and contractors.

84.     As discussed above, AGS does not have its own facilities capable of performing the work it claimed it could in the SBIR Proposal and agreed to do in the SBIR Contract.

85.     In the SBIR Proposal, Defendants represented that AGS had nine employees, but, other than Mr. Iafallo, AGS has no employees who were not otherwise employed by PST or were PST contractors.

86.     As a result, the work for the SBIR Contract was performed by PST employees or contractors, including purported subcontractors controlled by PST and Yumshtyk from Alon Surface Technology Inc. and Prognostica, at PST's facilities.

87.     As further evidence that AGS is shell company that operates on behalf of PST, Yumshtyk only publicizes his role in PST, while not publicly mentioning AGS.

88.    According to Yumshtyk's LinkedIn profile, he is "the Founder, President, and CEO of Paradigm Shift Technologies Inc." Yumshtyk did not list AGS on his LinkedIn profile.

89.    Yumshtyk's LinkedIn profile also references PST's "exclusive and environmentally friendly EPVD® technology has set a new standard in the industry," which is the subject of the SBIR Contract awarded to AGS.

90.    Additionally, according to AGS's website, AGS's phone number, 1-888-748-1778, is the same phone number of PST.

91.    In sum, AGS was merely a façade that enabled PST to obtain contracts with the government, including the SBIR Contract, that it would not otherwise be able to obtain.

92.    Consequently, PST performed the work under the SBIR Contract that was supposed to be performed by AGS.

93.    AGS, therefore, did not perform at least half of the work under the SBIR Contract as Defendants certified it would.

94.    PST would not have been eligible for a SBIR award.

95.    SBIR awards are only available to SBCs. *See supra* ¶ 22.

96.    To qualify as an SBC, an entity must have a place of business in the United States and operate primarily within the United States or makes a significant contribution to the United States economy through payment of taxes or use of American products, materials or labor.

97.    PST, a Canadian business with no locations in the United States, did not satisfy these requirements.

### iii.  Yumshtyk was not primarily employed by AGS.

98.     Despite the SBIR program requirement that a principal investigator, *i.e.*, Yumshtyk, be primarily employed by the awardee, *i.e.*, AGS, and despite Yumshtyk's representation in the SBIR Funding Agreement Certification that he would spend more than half of his time working for AGS, Yumshtyk was not primarily employed by AGS.

99.     The funding agreement officer did not approve, in writing or otherwise, a deviation to this requirement.

100.    Primary employment with a company precludes full-time work with another company during the period of the contract.

101.    At all times during the SBIR Contract, Yumshtyk was president and chief executive office of PST and, thus, employed full-time by PST.

102.    During the period of the SBIR Contract, PST was involved in other projects for other countries' militaries and foreign companies, including in Canada and in Europe.

103.    Given the substantial work that PST did, both on behalf of AGS and on other projects, Yumshtyk's primarily worked for PST.

### e.  Defendants submitted false claims for payment to the government.

104.    To obtain payments under the SBIR Contract, AGS submitted a "Public Service Voucher for Purchases and Services other than Personal", also known as a Standard Form 1034 ("SF1034") to the government that, among other things, detailed costs and expenses, including direct labor costs paid to purported AGS employees and contractors working on the SBIR Contract.

105.    In connection with the SBIR Contract, AGS submitted thirty-eight SF1034s between on or about December 3, 2019 and on or about March 8, 2023, and AGS requested $3,731,344.99 in payments pursuant to the SBIR Contract using SF1034s.

106.    The dates and the amounts of the SF1034s submitted by AGS for the SBIR Contract are listed below:

| Submitted Date | Amount |
|---|---|
| 12/3/2019 | $172,653.48 |
| 12/31/2019 | $236,277.24 |
| 1/31/2020 | $112,819.76 |
| 2/28/2020 | $159,998.72 |
| 3/31/2020 | $141,229.03 |
| 4/30/2020 | $137,244.61 |
| 5/31/2020 | $79,989.66 |
| 7/1/2020 | $91,902.47 |
| 7/31/2020 | $85,699.58 |
| 8/31/2020 | $108,811.48 |
| 9/30/2020 | $118,606.21 |
| 11/1/2020 | $134,521.59 |
| 11/30/2020 | $106,703.92 |
| 1/4/2021 | $258,749.16 |
| 2/12/2021 | $8,565.71 |
| 3/1/2021 | $137,098.89 |
| 4/2/2021 | $47,135.15 |
| 5/5/2021 | $119,491.44 |
| 6/1/2021 | $90,618.97 |
| 7/1/2021 | $154,188.31 |
| 7/30/2021 | $123,292.73 |
| 9/9/2021 | $150,172.28 |
| 9/30/2021 | $89,404.41 |
| 11/3/2021 | $80,693.13 |
| 12/4/2021 | $79,536.20 |
| 1/4/2022 | $85,885.97 |
| 2/3/2022 | $83,061.68 |
| 3/2/2022 | $80,052.93 |
| 3/31/2022 | $75,598.20 |

| | |
|---|---|
| 5/4/2022 | $70,985.12 |
| 6/3/2022 | $52,900.14 |
| 7/6/2022 | $53,308.31 |
| 7/29/2022 | $52,491.99 |
| 9/1/2022 | $53,876.72 |
| 10/3/2022 | $9,727.65 |
| 11/2/2022 | $22,679.81 |
| 12/1/2022 | $29,610.40 |
| 3/3/2022 | $35,761.94 |

107.    In requesting payment, Defendants expressly and/or impliedly certified their compliance with the SBIR Contract and SBIR program requirements.

108.    However, Defendants failed to disclose their non-compliance with the SBIR Contract and the SBIR program rules and regulations.

109.    Additionally, Defendants submitted SF1034s that included costs and expenses that were not incurred or eligible to be reimbursed under the SBIR Contract.

110.    For example, Defendants sought reimbursement of direct labor costs for wages purportedly paid to individuals who did not perform work in connection with the SBIR Contract or did not perform work as represented on the SF1034s and supporting documents.

111.    Defendants also sought reimbursement for expenses that were not related to SBIR Contract work, including for a condominium located in Florida used by Yumshtyk.

## II.    Defendants Acted with Knowledge

112.    Defendants knew that their representations and certifications, express and implied, in the SBIR Contract, in the SBIR Funding Agreement Certification, and on SF1034s were false at the times they were made.

113.    But Defendants never intended that R&D would be conducted at the Orchard Park Location; rather, Defendants intended the work to be conducted at PST's facilities in Canada.

114.    As noted above, the Orchard Park Location did not have the equipment to perform the work under the SBIR Contract, including R&D work.

115.    Defendants misrepresented the equipment at PST's facilities in Canada as AGS's equipment in the SBIR Proposal as early as February 2019—several months *before* agreeing to the SBIR Contract and certifying that the R&D work would occur in the United States in the SBIR Funding Agreement Certification.

116.    During the period of the performance of the SBIR Contract, R&D work was performed in Canada, not in the United States.

117.    The only AGS employee based in the United States, Mr. Iafallo, lacked the training or expertise to conduct the R&D for the SBIR Contract.

118.    Despite certifying that AGS would perform more than half of the work, Defendants intended PST to perform the work under the SBIR Contract because that AGS was not capable of carrying out R&D or other work under the SBIR Contract.

119.    Defendants' intention for PST to be the entity performing the SBIR Contract is highlighted by Defendants holding out PST as the awardee of the SBIR Contract on the PST website and to the press.

120.    And given Yumshtyk's control of PST, that PST performed the vast majority, if not all, of the work on the SBIR Contract, and PST's other engagements with foreign governments and companies, Yumshtyk knew his primary employment was with PST, not AGS.

121.    Moreover, by signing the SBIR Funding Agreement Certification, Yumshtyk acknowledged that failure to ensure that the information in the SBIR Funding Agreement Certification was true and accurate could subject AGS to civil and criminal liability, including liability under the FCA.

122.    Defendants' knowledge is further demonstrated by their active concealment of their non-compliance well after they had begun work on the SBIR Contract.

123.    In February of 2021, an auditor with the Defense Contract Audit Agency ("DCAA") questioned Yumshtyk and an accountant for AGS in connection with a review of AGS's fiscal year 2019 expenses.

124.    Defendants' responses were misleading and concealed their non-compliance with material terms of the Contract.

125.    The DCAA auditor noticed that the Orchard Park Location did not appear to be a commercial office space and asked Defendants to confirm that it was, indeed, AGS's address.

126.    In response, AGS acknowledged that the Orchard Park Location was "in a rural residential area" and used for gun barrel storage but misleadingly added that "desks and offices are maintained in the other area of the building."

127.    In a follow up email, the DCAA auditor asked for "a detailed explanation of exactly what work is performed at the office location in Orchard Park."

128.    Defendants replied, again misleadingly, that "the leased premises are used for office work as well as temporary storage of Gun Barrels. The office work includes logistics, planning of experiments and processes, engineering, recording and analyzing experimental data, material analysis data, communications with customers and contractors, etc."

129.    This response was false. The only work at the Orchard Park Location involved the storage and shipping of gun barrels.

130.    The allusion to "planning of experiments and processes, engineering, recording and analyzing experimental data, material analysis data" falsely suggested that R&D was taking place in the United States, as required by the SBIR Contract, the SBIR program rules, and the SBIR Funding Agreement Certifications.

131.    To further obscure the fact that no R&D occurred at the Orchard Park Location, Defendants falsely replied to the DCAA auditor that Yumshtyk "spent ~55% of his time in Orchard Park facility."

132.    In fact, Yumshtyk rarely visited the Orchard Park Facility.

133.    Defendants claimed that Alla Yumshtyk, the purported owner and Director of Engineering of AGS, "spent ~80% of her time in Orchard Park facility."

134.    Alla Yumshtyk did not visit the Orchard Park Facility, let alone work there.

135.    Defendants also claimed that Dmitri Ivanov, a purported Scientist and Process Engineer, "spent ~80% of his time in Orchard Park facility" where he was responsible for, among other things, "developing, planning and conducting experiments; recording and analyzing data; carrying out fieldwork, eg collecting samples; presenting results to senior/other research staff, writing research papers, reports, reviews and summaries; demonstrating procedures."

136.    Mr. Ivanov, too, did not visit or work at the Orchard Park Location, let alone perform R&D tasks there or in connection with the SBIR Contract.

137.    Although Mr. Ivanov performed no work at the Orchard Park Location, Defendants submitted SF1034s in which they sought reimbursement for direct labor costs purportedly incurred by him.

138.    Defendants also concealed their relationship with and impermissibly charged the government for costs and expenses from purported arms-length subcontractors, such as Alon Surface Technologies, Inc., Prognostica, and PST.

139.    In their response to the DCAA auditor, Defendants described Alon Surface Technologies Inc. as "an arms-length third party," despite it being controlled by Yumshtyk and his family and sharing a location and contact information with PST.

### III.    Defendants' False Claims and Representations were Material

140.    Defendants' false and fraudulent claims and representations—including, that R&D would be performed in the United States, that AGS would perform more than half of the work under the SBIR Contract, and that Yumshtyk would work primarily for AGS—were material to the United States' decision to pay Defendants approximately $3,731,344.99 based on each any every SF1034.

141.    Defendants' false certifications, representations, and statements prior to entering the SBIR Contract, at the time of entering the SBIR Contract, and during the performance of the SBIR Contract, influenced the United States' decision to make payments to AGS.

142.    Additionally, 15 U.S.C. § 638(j) requires SBA to set uniform eligibility requirements for the SBIR program through "policy directives for the general conduct of the SBIR programs within the Federal Government."

143.    SBA issued Policy Directives that detailed eligibility requirements for the SBIR program that include the requirement that R&D be performed in the United States, that the applicant perform at least half of the work under a SBIR contract, and that the principal investigator work primarily for the awardee.

144.    These eligibility requirements serve to further the purposes of the SBIR program, which, among other things, is to encourage small businesses engaged in innovation that will improve United States competitiveness in key sectors, such as defense.

145.    Similarly, Defendants false representations on the SF1034s regarding costs and expenses directly influence how much the government would pay under the SBIR Contract.

146.    The United States regularly pursues cases in which companies obtain SBIR awards and seek payments through false statements and certifications, including against companies that perform R&D outside of the United States. *See* https://www.justice.gov/usao-edva/pr/software-company-settles-fraud-case-524947 (accessed on April 22, 2025).

147.    In addition to false representation about where an awardee was performing R&D, the Department of Justice has reached settlements with SBIR awardees who have made other misrepresentations. *See* https://www.justice.gov/usao-edva/pr/government-contractor-resolves-false-claims-act-allegations-related-small-business (accessed on April 22, 2025); https://www.justice.gov/usao-sdoh/pr/spectro-scientific-agrees-pay-1m-settle-allegations-related-air-force-s-small-business (accessed on April 22, 2025); *see also United States ex rel. Longhi v. Lithium Power Techs. Inc.*, 575 F.3d 458, 471-72 (5th Cir. 2009) (holding that false statements and representation in connection with a SBIR award were material to the government's decision to award the SBIR contract).

148.    Had the United States known that the R&D work was performed in Canada, that AGS did not perform at least half of the work on the SBIR Contract, that Yumshtyk's primary employment was not with AGS, and of the fraudulent representations on the SF1034s, it would not have paid each of the thirty-eight SF1034s presented to the United States for payment.

## FIRST CAUSE OF ACTION

**Violations of the False Claims Act: Presentation of False Claims**
**(31 U.S.C. § 3729(a)(1)(A))**

149.    The United States incorporates by reference each of the preceding paragraphs as if fully set forth in this paragraph.

150.    The United States seeks relief against Defendants under Section 3729(a)(1) (2006), and, as amended, 31 U.S.C. § 3729(a)(1)(A) of the False Claims Act.

151.    In connection with the foregoing schemes, Defendants knowingly, or with deliberate ignorance or reckless disregard for the truth, presented and/or caused to be presented to the United States false or fraudulent claims for payments.

152.    Defendants' claims for payments were rendered false and/or fraudulent because of express or implied certifications made by Defendants.

153.    By reason of these false claims, the United States has sustained damages in an amount to be determined at trial, and is entitled to a civil penalty as required by law for each violation.

## SECOND CAUSE OF ACTION

### Violations of the False Claims Act: Making or Using a False Record or Statement
### (31 U.S.C. § 3729(a)(1)(B))

154.    The United States incorporates by reference each of the preceding paragraphs as if fully set forth in this paragraph.

155.    The United States seeks relief against Defendants under Section 3729(a)(2), and, as amended, 31 U.S.C. § 3729(a)(1)(B).

156.    In connection with the foregoing schemes, Defendants knowingly, or with deliberate ignorance or in reckless disregard for the truth, made, used or caused to made and used, false records and statements material to false and fraudulent claims that were made to the United States.

157.    These false statements and records include false certifications or false representations of compliance with contractual terms, applicable laws, and regulations.

158.    By reason of these false claims, the United States has sustained damages in an amount to be determined at trial, and is entitled to a civil penalty as required by law for each violation.

## THIRD CAUSE OF ACTION

### Violations of the False Claims Act: Reverse False Claim
### (31 U.S.C. § 3729(a)(1)(G))

159.    The United States incorporates by reference each of the preceding paragraphs as if fully set forth in this paragraph.

160.    The United States seeks relief against Defendants under Section 3729(a)(2), and, as amended, 31 U.S.C. § 3729(a)(1)(G).

161.    In connection with the foregoing schemes, Defendants knowingly, or with deliberate ignorance or in reckless disregard for the truth, concealed or improperly avoided or decreased an obligation to pay or transmit money to the government, including for payments Defendants received costs and expenses that were not eligible for reimbursement.

162.    By virtue of Defendants' acts of concealment and/or improper avoidance, the United States has sustained damages in an amount to be determined at trial, and is entitled to a civil penalty as required by law for each violation.

## FOURTH CAUSE OF ACTION

### Common Law Fraud

163.    The United States incorporates by reference each of the preceding paragraphs as if fully set forth in this paragraph.

164.    Defendants made material misrepresentations of fact, with knowledge of, or in reckless disregard of, their truth, in connection with the claims for payment submitted by, or on behalf of, Defendants to the United States.

165.    Defendants intended that the United States rely upon the accuracy of the false representations referenced above.

166.    The United States made substantial payments of money in justifiable reliance upon Defendants' false representations.

167.    Defendants' actions caused the United States to be damaged in a substantial amount to be determined at trial.

## FIFTH CAUSE OF ACTION

### Unjust Enrichment

168.    The United States incorporates by reference each of the preceding paragraphs as if fully set forth in this paragraph.

169.    By reason of the payments to defendants, Defendants were unjustly enriched. The circumstances of Defendants' receipt of the contract at issue are such that, in equity and good conscience, Defendants are liable to account for and pay such amounts, which are to be determined at trial.

## SIXTH CAUSE OF ACTION

### Payment by Mistake of Fact

170.    The United States incorporates by reference each of the preceding paragraphs as if fully set forth in this paragraph.

171.    The Defendants' misstatements regarding his entitlement to payment from the United States caused government officials to make wrongful and incorrect payments to the Defendants. The United States is entitled by law to recover these payments.

## PRAYER FOR RELIEF

172.    WHEREFORE, the United States demands and prays that judgment be entitled in its favor against Defendant as follows:

    i.    On First, Second, and Third Causes of Action, under the FCA, for the amount of the United States' damages, trebled as required by law, and such civil penalties as are authorized by law;

    ii.    On the Fourth Cause of Action, Common Law Fraud, for an amount to be determined at trial, together with costs and interest;

    iii.    On the Fifth Cause of Action, Unjust Enrichment, for an amount to be determined at trial, together with costs and interest;

iv.   On the Sixth Cause of Action, Payment by Mistake of Fact, for an amount ot be determined at trial, together with costs and interest; and

v.   For all such further relief as may be just and proper.

## DEMAND FOR JURY TRIAL

The United States demands a jury trial in this case.

Respectfully submitted,
MICHAEL DIGIACOMO
United States Attorney

s/David M. Coriell
DAVID M. CORIELL
Assistant United States Attorney
138 Delaware Avenue
Buffalo, New York 14202
(716) 843-5731
david.coriell@usdoj.gov